IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| Sean Washington, | ) | |
| | ) | Case No. 14 C 6590 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Don T. Hanke, et al., | ) | Judge Philip G. Reinhard |
| | ) | |
| Defendants. | ) | |

## ORDER

For the reasons stated below, defendants' motions for summary judgment [84]; [87] are granted. Plaintiff's motion to strike [92] and Dr. Dominguez's motion to strike [96] are both denied. Civil case terminated.

## STATEMENT - OPINION

This matter arises out of plaintiff Sean Washington's Third Amended Complaint against several healthcare professionals at Dixon Correctional Center, Dr. Bessie Dominguez, Director of Nursing Travis Hantke, and Nurse Lynn Chattic. *See* [67]. Plaintiff claims that Dr. Dominguez, Nurse Hantke, and Nurse Chattic were deliberately indifferent to his medical needs when he complained to them that his wheelchair, to which he was confined, had a wobbly wheel. Plaintiff was directed by several of the defendants to sign up for a wheelchair repair clinic, but before the clinic took place the wheel popped off his wheelchair and he suffered injuries. Plaintiff claims 42 U.S.C. § 1983 deliberate indifference against all parties, as well as related claims under the Americans with Disability Act of 1990 ("ADA"), 42 U.S.C. § 12101.

On July 11, 2016, Dr. Dominguez filed a motion for summary judgment [84] and memorandum in support [85]. Nurse Hantke and Nurse Chattic also filed a joint motion for summary judgment [87] and memorandum [88]. All three defendants filed a joint Rule 56.1 statement of material facts [86].

On September 27, 2016, plaintiff filed a motion to strike defendants' Rule 56.1 statement and memorandum in opposition to all defendants' motions for summary judgment [92], as well as a response to the defendants' 56.1 statement [92-11], and statement of additional material facts, which was later filed as a separate docket entry [103].

On October 18, 2016, Dr. Dominguez filed a reply and motion to strike plaintiff's statement of additional facts [96]. Nurse Hantke and Nurse Chattic filed a joint reply [98]. All

1

defendants filed a joint response to plaintiff's statement of material facts [97]. The foregoing matters are now ripe for the court's review.

On summary judgment, the court construes all facts and draws all inferences in the light most favorable to the non-moving party. *Schepers v. Commissioner, Indiana Dept. of Corrections,* 691 F.3d 909, 913 (7th Cir. 2012). The court does not weigh evidence or determine the credibility of witness testimony. *O'Leary v. Accretive Health, Inc.,* 657 F.3d 625, 630 (7th Cir. 2011). Instead, the court only grants summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). That said, Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Prior to addressing the merits of defendants' motion, it is necessary to set forth the undisputed facts located in the parties' Local Rule 56.1 Statements of Material Fact, as well as plaintiff's version of relevant disputed facts. In addition, the court is cognizant of its obligation to construe all disputed and undisputed facts in the light most favorable to plaintiff and does so accordingly. *See Schepers*, 691 F.3d at 913.

## A. FACTUAL BACKGROUND.

1. The parties' motions to strike.

As noted, plaintiff has filed a motion to strike the defendants' Rule 56.1 joint statement of undisputed material facts, on the grounds that "Defendants have blatantly failed to follow Local Rule 56.1's requirement that each paragraph contain one or two individual allegations." *See* [92] at 4. Defendants respond that each of their paragraphs are focused on a single subject. The court has reviewed the relevant paragraphs and agrees with defendants. As such, plaintiff's motion to strike [92] is denied.

Dr. Dominguez has also filed a motion to strike plaintiff's statement of additional facts, on the grounds that it was submitted as an exhibit rather than a separate document and did not include relevant citations to the record. *See* [96] at 2. The court notes that plaintiff has largely rectified these errors after being allowed by Magistrate Judge Johnston to re-file his statement of additional facts with relevant attachments. *See* [99-106]. As such, Dr. Dominguez's motion to strike [96] is denied.

2. The relevant events.

At all times relevant to this action, plaintiff, Sean Washington, was an inmate at Dixon Correctional Center. [92-11] at ¶ 1. Dr. Bessie Dominguez is a site physician at Dixon. *Id.* at ¶ 2. Lynn Chattic is a registered nurse employed at Dixon. *Id.* at ¶ 3. Travis Hantke was the Director of Nursing at Dixon. *Id.* at ¶ 4.

In September of 2009, plaintiff suffered multiple gunshot wounds to his head, lower chest, and leg. *Id.* at ¶ 5. Plaintiff was diagnosed with a seizure disorder in March of 2010, for which he takes Dilantin and Keppra. *Id.* Despite his paraplegia, plaintiff is able to walk with a quad cane. *Id.* Nevertheless, he primarily uses a wheelchair. *Id.* at ¶ 6.

Plaintiff arrived at Dixon on August 30, 2011 with his own wheelchair. *Id.* at ¶ 6. He was placed in a cell above the healthcare unit, which can accommodate wheelchairs. *Id.* On September 14, 2011, plaintiff saw Dr. Dominguez to request a quad cane, because he wanted to stop using a wheelchair to regain his strength through physical therapy. *Id.* at ¶ 8. He received a quad cane, his wheelchair was donated to the state, and he was transferred back to the general population. *Id.* at ¶¶ 8-9.

In May of 2012, Dr. Dominguez referred plaintiff to physical therapy, but in July of 2012 plaintiff was treated for seizures, was hospitalized, and returned to the ADA wing of the Healthcare Unit at Dixon. *Id.* at ¶¶ 11-13. While in the infirmary, plaintiff took receipt of State Wheelchair #60002 (the "infirmary wheelchair"). *Id.* at ¶ 15; [97] at ¶ 6.

Pamela Schafer worked in Central Supply at Dixon and was responsible for working with inmates in wheelchairs regarding their disabilities. *Id.* at ¶ 34. When Ms. Schafer learned that plaintiff was in possession of the infirmary wheelchair, she met with him so that he could sign a form acknowledging that it was in his possession. [97] at ¶ 12. On August 9, 2012, plaintiff signed a form acknowledging that he was in possession of the infirmary wheelchair. [97] at ¶ 13. It is undisputed that the receipt plaintiff signed included instructions on how to submit requests for wheelchairs and stated that the infirmary wheelchair was in good working order; it is also undisputed that plaintiff was told how to submit a request for wheelchair repairs and that inmates are told by prison staff when wheelchair repairs will occur. [92-11] at ¶ 15.

Shortly after receiving the infirmary wheelchair, plaintiff noticed that the rear left wheel was wobbly. *Id.* at ¶ 16. According to plaintiff, he spoke to several healthcare professionals about this issue. First, plaintiff mentioned the wobbly wheel to Nurse Chattic in passing in the healthcare unit, although he did not remember the specifics of his conversation with her. *Id.* According to plaintiff, he mentioned this to Nurse Chattic on several occasions. [97] at ¶ 17. Nurse Chattic does not recall the conversation and testified that she has no training in repairing wheelchairs. [92-11] at ¶ 28.

Plaintiff also spoke to Nurse Hantke about the wobbly wheel while in the dayroom of the ADA wing; Nurse Hantke replied that there was a date coming up in a few weeks when they would fix wheelchairs. *Id.* at ¶ 16; [97] at ¶ 22. According to plaintiff, he spoke to Nurse Hantke about this issue on more than one occasion. [97] at ¶ 21. Nurse Hantke does not recall the conversation, never rendered medical treatment to plaintiff, and has no training in repairing wheelchairs. [92-11] at ¶ 29.

Finally, plaintiff spoke to Dr. Dominguez during a medical visit regarding his medications; during this visit, he indicated to her that the wheel was wobbly and she told him to

3

sign up to have his wheelchair repaired. *Id.* at ¶ 16. According to plaintiff, he mentioned this to Dr. Dominguez on more than one occasion. [97] at ¶ 19. Dr. Dominguez does not recall the conversation. [97] at ¶ 20.

Following these conversations, plaintiff signed up to have his wheelchair fixed during an upcoming repair clinic. [92-11] at ¶ 17. He also spoke to Ms. Schafer, who told him that his wheelchair would be fixed and told him to submit paperwork in order to have the wheelchair repaired, which he did. *Id.* On the other hand, Ms. Schafer does not recall plaintiff complaining of a wobbly wheelchair and there is no documentation in the Central Supply records that plaintiff made a complaint or requested a repair. *Id.* at ¶ 47.

On September 1, 2012, before his wheelchair could be fixed, plaintiff was wheeling himself out of the door of his cell when the rear left wheel of his wheelchair came off; plaintiff fell backwards, and hit his shoulder, back, and head. *Id.* at ¶ 18. Plaintiff did not have a seizure at that time. *Id.*

Members of the healthcare staff, including Nurse Chattic, were summoned and plaintiff was brought to the healthcare unit. *Id.* at ¶ 19. Plaintiff informed Nurse Chattic that his head and back hurt, and Nurse Chattic put him in line to see a doctor. *Id.* The same day, an injury report was completed and a neurological assessment was conducted for plaintiff, which was normal. *Id.* at ¶ 20. Plaintiff was scheduled for a medical visit with Dr. Dominguez and was returned to the ADA wing. *Id.* at ¶ 20, 24.

On September 6, 2012, Dr. Dominguez treated plaintiff and conducted a physical exam; she made no particular findings other than tenderness and prescribed plaintiff pain medication and warm compresses. *Id.* at ¶ 21. Plaintiff did not mention a headache or head injury at that time. *Id.* at ¶ 22. Plaintiff's demeanor and speech was normal and he was oriented. *Id.* He did not report any neurological problems. *Id.* As such, Dr. Dominguez's opinion was that plaintiff's fall from his wheelchair did not negatively impact his seizure disorder. *Id.*

It is undisputed that plaintiff never underwent an MRI. The parties do dispute whether Dr. Dominguez specifically recommended to plaintiff that he not undergo an MRI. *Id.* at ¶ 23. On the other hand, it is undisputed that he had metal fragments in his body, and that an MRI is contraindicated for a patient with metal shards in their body because those shards could move through the patient's body. *Id.*

After falling from his wheelchair, plaintiff suffered a number of seizures, approximately once or twice per month, for which he was placed in the infirmary. *Id.* at ¶ 26. He also had back pain and ongoing pain in his head, back, and legs due to his paraplegia. *Id.* at ¶ 27. According to plaintiff, prior to his fall, he was not experiencing regular headaches or back pain, but after the fall he has been experiencing regular headaches and back pain. [97] at ¶¶ 31-34. Further, according to plaintiff, he has gone from having approximately six seizures per year to approximately twelve seizures per year. [97] at ¶ 36.

4

3. Dixon policies and practices for repairing a wheelchair.

The parties have pointed to several methods by which inmates can seek to have their wheelchairs repaired. One method of repairing a wheelchair is to contact Central Supply. If an inmate has an issue with a wheelchair, he can fill out a repair form, specifying the issue, and return the form to the control officer of the housing unit, who will send it to Central Supply. [92-11] at ¶ 37. Inmates can also submit a written request to Central Supply to request a repair. *Id.* at ¶ 40. When Central Supply receives an inmate wheelchair repair request, the chair is brought to Central Supply to be inspected and the Central Supply staff will discuss the wheelchair's issues with the inmate. *Id.* at ¶ 38. If the wheelchair must be fixed, it would either be replaced or the inmate would be signed up for a wheelchair clinic. *Id.* at ¶ 40. If the issue cannot be immediately remedied and an inmate must wait for a clinic, a state-loaned wheelchair can be provided until the inmate's wheelchair is repaired in the wheelchair repair clinic. *Id.* at ¶ 38. Dixon keeps several "loaner" wheelchairs for inmates to use as backups, such that if an inmate needs to borrow one, he can. *Id.* at ¶ 32. There were extra wheelchairs on the first floor of Dixon's healthcare unit and plaintiff knew where they were. *Id.* at ¶ 33. According to plaintiff, however, inmates do not have direct access to Central Supply and a correctional officer must place an order or a nurse must contact Ms. Schafer to explain the needs of a particular inmate. [97] at ¶ 23. Plaintiff does not indicate that he requested a temporary wheelchair when he discovered that his was wobbly.

Another option for an inmate to request a repair is to go to sick call to report the condition of the wheelchair. *Id.* at ¶ 40. While plaintiff knew how to sign up for sick call and had done so in the past, he did not do so to request repair or replacement of his wheelchair. *Id.* at ¶ 41. To replace a wheelchair, an inmate would need to have a new chair ordered by a medical doctor. *Id.* at ¶ 43. It is undisputed that physicians and nurses at Dixon do not repair wheelchairs themselves. *Id.* at ¶ 44. Dr. Dominguez has no training in wheelchairs, does not repair wheelchairs for inmates, and is aware of the repair clinic but has no involvement with it. *Id.* at ¶ 45. No inmate has ever asked her to repair a wheelchair and if an inmate comments on an issue, she would tell the inmate to sign up for sick call or talk to security about the repair process. *Id.* at ¶ 46. When inmates have asked her for a new wheelchair, she will attempt to discover what is wrong with it and, if necessary, write a note to Central Supply ordering a new wheelchair for the inmate. *Id.* If she noticed an inmate with a malfunctioning wheelchair, the medical staff would talk to the head nurse to take a note and follow through with Central Supply. [97] at ¶ 16.

Finally, as indicated, when Central Supply receives enough repair requests, the staff contacts a medical products group and sets up a wheelchair repair clinic. [92-11] at ¶ 39. Ms. Schafer would post the date of the clinic and give inmates time to complete their repair forms, which would be sent to the medical products group for review prior to the clinic. *Id.* According to plaintiff, wheelchair repair clinics occur every four months. [97] at ¶ 25.

With regard to loose wheels, Dixon points out in its statement of undisputed facts that Ms. Schafer has never seen a large rear wheel of a wheelchair pop off, and in her opinion, the only way such a wheel could come off is if someone intentionally loosened the six-inch bolt that

5

holds the wheel in place. [92-11] at ¶ 48. According to plaintiff, a wobbly or loose wheel can be an emergency concern for an inmate in a wheelchair because it impacts the inmate's ability to be mobile. [97] at ¶ 26.

4. Plaintiff's factual support for his discrimination claims.

Plaintiff felt discriminated against by Dr. Dominguez by not "fulfilling his needs" regarding his wheelchair and being "hostile" to him in the healthcare unit, although he does not recall how many times he saw Dr. Dominguez between the time he received his wobbly wheelchair and when it broke. [92-11] at ¶ 50. Nonetheless, plaintiff does not dispute that Dr. Dominguez was a "cheerleader" for plaintiff and did not discriminate against him, has never seen anyone discriminate against him, did not keep him from signing up to have his wheelchair repaired, and has always tried to help him. *Id.* at ¶ 53. Plaintiff felt Nurse Chattic discriminated against him by having a hostile attitude toward him. *Id.* at ¶ 51. He felt discriminated by Nurse Hantke because he did not help plaintiff with his wheelchair issues, although he has never seen Nurse Hantke repair an inmate's wheelchair. *Id.* at ¶ 52.

## B. ANALYSIS

Defendants have moved for summary judgment on all of plaintiff's claims, which include both deliberate indifference claims under 42 U.S.C. § 1983 and discrimination claims under the Americans with Disability Act of 1990 ("ADA"), 42 U.S.C. § 12101. As a preliminary matter, defendants argue in their respective motions for summary judgment that plaintiff has not proffered sufficient facts to survive summary judgment on his discrimination claims, in part because they are not "public entities" within the meaning of the ADA. In their reply, defendants point out, and the court agrees, that plaintiff has failed to address this issue in his response. As such, it appears that plaintiff has waived his ADA claims against all defendants. Regardless, the court agrees with defendants' arguments and grants the motions for summary judgment with respect to all ADA claims.

With respect to plaintiff's deliberate indifference claims, it appeared from plaintiff's third amended complaint that he was challenging both the defendants' failure to repair his wheelchair and their failure to provide appropriate medical care once he fell. In their respective motions for summary judgment, defendants argued that plaintiff had not proffered sufficient facts to survive summary judgment on either the defendants' pre-accident or post-accident conduct. However, plaintiff did not address the defendants' post-accident conduct in his response. Defendants point this out in their reply and ask the court to consider abandoned plaintiff's claims with respect to defendants' post-accident conduct. The court agrees that plaintiff has abandoned those claims and summary judgment is granted with respect to defendants' post-accident conduct. As such, only plaintiff's deliberate indifference claims against Dr. Dominguez, Nurse Hantke, and Nurse Chattic for their pre-accident conduct is at issue here.

"Deliberate indifference occurs when a defendant realizes that a substantial risk of serious harm to a prisoner exists, but then disregards that risk." *Perez v. Fenoglio*, 792 F.3d 768,

776 (7th Cir. 2015) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (plaintiff must show that officials are "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and they must also draw the inference.")). "The deliberate indifference standard reflects a mental state somewhere between the culpability poles of negligence and purpose, and is thus properly equated with reckless disregard." *Id.* at 777. "Deliberate indifference may occur where a prison official, having knowledge of a significant risk to inmate health or safety, administers 'blatantly inappropriate' medical treatment, acts in a manner contrary to the recommendation of specialists, or delays a prisoner's treatment for non-medical reasons, thereby exacerbating his pain and suffering." *Id.*

Because both parties treat them as such, at this time the court will assume without deciding that plaintiff's claims against his medical providers allege cognizable claims of deliberate indifference to medical needs. However, the court notes that during initial screening, plaintiff's claims against his medical professionals were allowed to proceed in large part due to his allegations regarding their post-accident treatment and medical decisions. It is far from clear that the wobbly wheel on plaintiff's wheelchair alone presented an objectively serious medical condition within the meaning of § 1983 deliberate indifference to medical needs. It appears that plaintiff attempts to do so by characterizing the medical providers' reaction to the wobbly wheel as an extension of their treatment of plaintiff's disability more generally, a somewhat tenuous link.

Regardless, even assuming that plaintiff's claims are cognizable, it is clear that they cannot survive summary judgment on this record. Plaintiff has proffered no evidence that Dr. Dominguez, Nurse Hantke, or Nurse Chattic were aware or had the information to infer that the wobbly wheel on the infirmary wheelchair presented a serious risk that the wheel would fall off and cause plaintiff to be injured. To the contrary, Ms. Schafer testified that she has never seen a large rear wheel of a wheelchair pop off, and in her opinion, the only way such a wheel could come off is if someone intentionally loosened the six-inch bolt that holds the wheel in place. *See* [92-11] at ¶ 48. It is also undisputed that the medical professionals had no training in wheelchair repair. Plaintiff does not even appear to seriously claim that the risk of his wheel coming off should have been obvious to his medical providers, instead asserting in his statement of additional facts that a wobbly or loose wheel can be an emergency concern for an inmate in a wheelchair because it can impact the inmate's ability to be mobile. *See* [97] at ¶ 26. However, there was no evidence that plaintiff's medical providers were aware that his wobbly wheel was seriously impacting his mobility or that there was a significant risk it would do so in the future.

Further, it is undisputed that Dr. Dominguez, Nurse Hantke, and Nurse Chattic responded to plaintiff's complaints about his wobbly wheel by informing him about an upcoming repair clinic or advising him to sign up, which according to plaintiff would likely occur within four months. Thus, the defendants presented plaintiff with a plan to correct the problem he complained to them about. Given the lack of evidence on this record that the medical providers should have been aware that plaintiff's wheel could fall off, it cannot be said that their plan was so "blatantly inappropriate" that it amounted to deliberate indifference. *Perez*, 792 F.3d at 777. Nor could it be said on this record that they acted in a manner contrary to the recommendation of

other specialists or unduly delayed plaintiff's treatment in a manner that would constitute deliberate indifference. *See id.* As such, plaintiff's claims against them must fail.

Because plaintiff has failed to raise a genuine issue of material fact as to whether Dr. Dominguez, Nurse Hantke, or Nurse Chattic were deliberately indifferent to his medical needs, defendants' motions for summary judgment [84]; [87] are granted. Civil case terminated.

Date: 12/02/2016                                              ENTER:

*Philip G. Reinhard*

United States District Court Judge

Electronic Notices. (LC)